## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE** | § | |
| **CORPORATION as Receiver for** | § | |
| **The First National Bank of Olathe,** | § | |
| | § | |
| **Plaintiff,** | § | **Case No. 14-2396** |
| | § | |
| **v.** | § | |
| | § | |
| **MATTHEW DEAN LINDAMOOD,** | § | |
| **TYRONE K. HERBERT,** | § | |
| **JOHN R. NIXON, NICHOLAS PFLUMM,** | § | |
| **BRIAN L. ROBY, ERMA L. GLASNAPP,** | § | |
| **RANDY GLASNAPP, DENNIS MEYER,** | § | |
| **DALE M. SCHWADER, GEORGE D.** | § | |
| **THOMPSON, C.J. WELTSCH, AND** | § | |
| **CHERYL WRIGHT,** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver of the First National Bank of Olathe ("FDIC-R"), hereby files its Complaint against Defendants Matthew Dean Lindamood ("Lindamood"), Tyrone K. Herbert ("Herbert"), Nicholas Pflumm ("Pflumm"), Brian L. Roby ("Roby"), and George D. Thompson ("Thompson") (collectively, the "Executive Officers"), and Erma L. Glasnapp ("E. Glasnapp"), Randy Glasnapp ("R. Glasnapp"), Dennis Meyer ("Meyer"), Dale M. Schwader ("Schwader"), C.J. Weltsch ("Weltsch"), and Cheryl Wright ("Wright") (collectively, the "Non-Officer Directors"), and John R. Nixon ("Nixon"), (collectively, the Executive Officers, the Non-Officer Directors and Nixon are referred to herein as the "Defendants") for damages that the Defendants caused by their tortious conduct, showing the Court the following:

## I.   INTRODUCTION

1.      The FDIC brings this case in its capacity as Receiver of The First National Bank of Olathe ("FNBO" or "Bank"), pursuant to authority granted by 12 U.S.C. § 1821.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all rights, titles, powers, and privileges of the Bank and, among others, the depositors, accountholders, and stockholders of the Bank, including, but not limited to, FNBO's claims against the Bank's former directors and officers as set forth herein.  In this action, the FDIC-R seeks to recover damages resulting from the tortious conduct of the Defendants.  The FDIC-R is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819.

2.      The FDIC-R seeks to recover compensatory damages of at least $19.93 million caused by Defendants' tortious conduct in connection with six loans—including four commercial real estate ("CRE") loans, one commercial loan, and one loan participation—that were approved between December 27, 2007 and August 20, 2008 (collectively, the "Loss Transactions," which are set forth in detail in paragraphs 55-98, below), in violation of the Bank's Loan Policy and prudent lending practices, as alleged more particularly below.

3.      The Executive Officers breached their fiduciary duties to FNBO and were negligent and grossly negligent by, among other things, approving Loss Transactions, in violation of FNBO's loan policies and prudent lending practices.

4.      Nixon and the Non-Officer Directors breached their fiduciary duties to FNBO and were grossly negligent by, among other things, approving Loss Transactions, in violation of FNBO's loan policies and prudent lending practices.

5.      In this lawsuit, the FDIC-R does not seek to collect from FNBO's borrowers or guarantors any unpaid loans, but rather seeks to collect damages from the Defendants for negligence, gross negligence, and breaches of fiduciary duties.  The compensatory damages

sought herein are those caused by the Defendants' tortious and wrongful conduct in approving such lending of depositors' money, which is the direct and proximate cause of the damages the FDIC-R now seeks to recover.

6.      As officers and directors, Defendants had the duty to safeguard FNBO's financial condition, make informed, good-faith decisions, and ensure safe and sound banking practices, including operating and managing the lending function of the Bank.  Defendants were obligated to comply and ensure compliance with banking laws, regulations, and supervisory guidance.

7.      Among other things, Defendants:

a.      improperly extended credit to borrowers who were not creditworthy;

b.      extended credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information, resulting in loans advanced to borrowers with no apparent ability to repay or otherwise service the loans;

c.      approved loans and loan participations which violated FNBO's loan policies (referred to cumulatively as the "Loan Policy") and applicable federal and state regulations, including loans which they knew would exceed the Bank's limits on the amount that could be loaned as a percentage of the value of the collateral securing the loan ("loan-to-value" or "LTV" ratios);

d.      approved loans in which appraisals on loan collateral were either not performed or failed to meet the requirements of the Uniform Standards of Professional Appraisal Practice or of state law and regulations;

e.      approved loans that they knew or had reason to know were improperly underwritten and/or imprudent, including origination and/or renewal of loans in which the borrowers lacked the demonstrated ability to repay, in which collateral was inadequate, in which security interests were not properly perfected, and/or in which collectability was not reasonably assured;

f.      allowed and encouraged excessive concentrations of CRE loans; and

g.      approved CRE loans, despite high-risk over-concentrations of such loans on the Bank's balance sheet, demonstrable deterioration in the Bank's existing CRE loan portfolio, and known adverse economic and market conditions.

8.      The FDIC-R seeks recovery of damages directly and proximately caused by Defendants' negligence, gross negligence, and breaches of fiduciary duty in their approval of the Loss Transactions.

## II.    JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction of this matter because actions in which the FDIC is a party are deemed to arise under federal law.  *See* 12 U.S.C. § 1811, *et seq*.; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345.  The FDIC has the power to bring suit in any court of law.  *See* 12 U.S.C. § 1819.

10.      This Court has personal jurisdiction over Defendants who at all relevant times were residents of and/or conducted the Bank's business in the State of Kansas.

11.      Venue is proper in this district under 28 U.S.C. § 139l(b) as one or more of the Defendants reside in this district and division and a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

### III.    THE PARTIES

12.    The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a).  The Office of the Comptroller of the Currency ("OCC") closed FNBO, a national bank, on August 12, 2011 and appointed the FDIC as Receiver for FNBO.  *See* 12 U.S.C. § 1821(c).

13.    When FNBO failed, it had $538.1 million in assets, and the loss to the Deposit Insurance Fund is currently estimated at $121.3 million.  The Bank was a wholly owned subsidiary of First Olathe Bancshares, Inc. ("FOB").

14.    Defendant Thompson was Chairman of the Board of Directors ("Board") from October 2000 until June 2011.  Thompson also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Thompson is a resident of the State of Kansas residing in Johnson County.

15.    Defendant Herbert was Vice President of FNBO from December 2005 until September 30, 2010.  Herbert also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Herbert is a resident of Kansas City, Jackson County, Missouri, and purposefully availed himself of the benefits and protections of the laws of the State of Kansas as Vice President and a member of the Loan Committee of the Bank from December 2005 until September 2010.  The claims in this suit relate directly to his actions as Vice President and a member of the Loan Committee of the Bank.

16.    Defendant Lindamood was Executive Vice President and Chief Credit Officer of FNBO from June 2004 until the Bank failed.  Lindamood also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Lindamood is a resident of the State of Kansas residing in Johnson County.

17.     Defendant Nixon was Chief Lending Officer of FNBO from December 2007 to February 2011.  Nixon also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Nixon is a resident of the State of Kansas residing in Johnson County.

18.     Defendant Pflumm was a lender of FNBO from November 1999 to September 2006, and Executive Vice President, Chief Operating Officer, and a director on FNBO's Board, from September 2006 until the Bank failed.  Pflumm also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Pflumm is a resident of the State of Kansas residing in Johnson County.

19.     Defendant Roby was Manager, Commercial Lending Specialization of FNBO from November 1990 to February 1999, Executive Vice President of FNBO from February 1999 to March 2001, and President, Chief Executive Officer, and a director on FNBO's Board, from March 2001 until the Bank failed.  Roby also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Roby is a resident of the State of Kansas residing in Johnson County.

20.     Defendant E. Glasnapp was a non-officer director who served on FNBO's Board from March 2002 until the Bank failed.  E. Glasnapp also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  E. Glasnapp is a resident of the State of Kansas residing in Johnson County.

21.     Defendant R. Glasnapp was a non-officer director who served on FNBO's Board from August 1990 until the Bank failed.  R. Glasnapp also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  R. Glasnapp is a resident of the State of Kansas residing in Johnson County.

22.     Defendant Meyer was a non-officer director who served on FNBO's Board from March 1992 until the Bank failed.  Meyer also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Meyer is a resident of the State of Kansas residing in Johnson County.

23.     Defendant Schwader was a non-officer director who served on FNBO's Board from December 1981 until the Bank failed.  Schwader also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Schwader is a resident of the State of Kansas residing in Johnson County.

24.     Defendant Weltsch was a non-officer director who served on FNBO's Board from January 2007 until February 2010.  Weltsch also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Weltsch is a resident of the State of Kansas residing in Johnson County.

25.     Defendant Wright was a non-officer director who served on FNBO's Board from October 2000 until the Bank failed.  Wright also served on the Bank's Loan Committee during the time the Loss Transactions were approved.  Wright is a resident of Kansas City, Jackson County, Missouri, and purposefully availed herself of the benefits and protections of the laws of the State of Kansas as a director of the Bank from October 2000 until August 2011.  The claims in this suit relate directly to her actions as a director and a member of the Loan Committee of the Bank.

26.     Among E. Glasnapp, R. Glasnapp, Meyer, Pflumm, Roby, Schwader, Thompson, Weltsch, and Wright, the Defendants comprised a majority of FNBO's Board of Directors, from as early as 2006 and continuing through the closing of the Bank on August 12, 2011.

IV.    **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

A.    **History of the Bank and Its Aggressive Growth**

27.    FNBO was chartered on June 7, 1887.  Beginning in about 2003, the Bank pursued an aggressive growth strategy without implementing appropriately strong risk management practices, resulting in excessive concentrations of questionably underwritten and monitored CRE loans.  It operated in six locations in Olathe, Kansas and, in 2003, opened a loan-production office in Phoenix, Arizona.  In 2007, FOB acquired First National Bank of Scottsdale ("FNBS").  FOB sold FNBS in 2010.

28.    In a CRE loan, a bank takes a security interest in real property used for commercial purposes as an additional source of repayment for a loan related to that property.  Regulators, the real estate industry, and lending institutions recognize that CRE loans have unique risks.  The borrower base includes significant numbers of project developers, builders, and speculators, often with multiple concurrent projects, whose revenues and costs are subject to fluctuations in real estate values, among other things.

29.    The Bank's Loan Policy recognized the unique risks of concentrations in real estate loans.  For example, the Loan Policy warned that "[a]ll new real estate credit extensions are to meet the highest standards of quality and are to be in strict compliance with the bank's policies."  *See* Loan Policy § 6.1-2.  The Loan Policy also stated that "[p]roject financing for non-owner occupied commercial properties is to be extended only to experienced and reputable developers with a track record in successfully developing and/or managing projects of the type for which financing is being requested from the bank," and that "[c]oncentration management … is probably more important in managing the bank's real estate exposure than it is in any other broad loan product type offered by the bank."  *See id.*, § 6.1-1.  The Loan Policy also mandated thorough research of CRE customers' creditworthiness, including obtaining "credit reports from reputable

reporting firms such as Dun & Bradstreet," conducting "commercial credit inquiries to other banks, major suppliers, and non-bank lenders," conducting "a UCC search," and obtaining "individual credit reports from individual guarantors." *See id.*, § 1.11–2.

30.     On or about January 13, 2006, the FDIC issued Financial Institution Letter FIL-4-2006, "Commercial Real Estate Lending," announcing proposed guidance by the federal bank and thrift regulatory agencies concerning sound risk management practices for concentrations in CRE lending.  The proposed guidance became final on December 12, 2006.  *See Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580-01 (Dec. 12, 2006) ("CRE Guidance").

31.     As explained in the release, the agencies issued the guidance in light of the increase in the number of banks whose risk management practices were not evolving with growing CRE concentrations.  The release noted the existence of "substantial potential risks posed by credit concentrations, especially in sectors such as CRE, which history has shown to have cycles that can, at much lower concentration levels, inflict large losses upon institutions," and that "concentrations in CRE lending coupled with weak loan underwriting and depressed CRE markets have contributed to significant credit losses in the past."

32.     Among other things, the CRE Guidance stated that regulators would consider banks with CRE concentrations exceeding 300% of risk-based capital, potentially exposed to significant CRE concentration risk, thereby warranting heightened risk-management practices.

33.     The CRE Guidance stressed that "strong risk management practices and appropriate levels of capital are important elements of a sound CRE lending program, particularly when an institution has a concentration in CRE loans."

34.     The Guidance admonished that the "key elements in establishing a risk management framework that effectively identifies, monitors, and controls CRE concentration risk [include] Board and management oversight; portfolio management; management information systems; credit underwriting standards; portfolio stress testing and sensitivity analysis; [and] credit risk review function."

35.     Notwithstanding promulgation of the CRE Guidance, Defendants continued to approve FNBO's CRE growth and increase its significant overconcentration risk in a way that far surpassed the concentrations in these types of loans at other similarly-sized banks.  In 2007 and 2008, the Bank's CRE loans as a percentage of total capital surpassed its peer group average by a wide margin.

36.     The comparison of these figures based on data in FNBO's quarterly Consolidated Reports of Condition and Income ("Call Reports") and Uniform Bank Performance Reports ("UBPR"), which were available to the Defendants, prior to and during the time the Loss Transactions were made is set forth below:

| UBPR Date | CRE Loans as % of Total Capital (FNBO) | CRE Loans as % of Total Capital (Peers) | FNBO CRE Percentile Compared to Peers |
|---|---|---|---|
| 12/31/04 | 558.02 | 330.64 | 89 |
| 12/31/05 | 639.57 | 358.11 | 94 |
| 6/30/06 | 641.70 | 369.36 | 93 |
| 12/31/06 | 655.39 | 371.58 | 94 |
| 6/30/07 | 651.85 | 373.61 | 94 |
| 12/31/07 | 654.22 | 377.34 | 93 |
| 3/31/08 | 628.68 | 377.80 | 91 |
| 9/30/08 | 656.88 | 411.62 | 91 |

37.     As reflected above, during the December 27, 2007 and August 20, 2008 period in which all of the Loss Transactions were approved, FNBO's CRE concentrations were consistently more than 150% of the regulatory threshold deemed to constitute a significant CRE

concentration risk.  Compared to its peer banks, FNBO's CRE concentrations routinely exceeded the 90th percentile.

38.    The information set forth in the table above was publicly available and readily accessible to all Defendants, each of whom had a duty to read and review the Bank's Call Reports and UBPRs before approving loans, and to determine the reason for significant variances in the Bank's performance when compared to its peer group.

39.    Although Defendants were or should have been aware that the Bank's CRE concentration far exceeded the triggers for special attention and were regularly provided with information of key economic indicators, such as trends in the real estate market, Defendants did not take sufficient action to limit CRE loan exposure, develop and implement plans to reduce or mitigate concentration risks, or curb or curtail further CRE lending.   Instead, Defendants continued to approve high-risk and speculative CRE loans and loan participations, including the Loss Transactions.  As a result, the Bank's adversely-classified assets, for which there is a risk of non-payment, doubled as a percentage of Tier 1 capital, from 20.5% in 2007 to 56% in 2008, with CRE loans comprising 88% of those assets.

40.    Defendants knew or should have known that concentrating a loan portfolio in CRE loans substantially increases a bank's risk for numerous reasons, including the well-known principles that: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the real estate and housing markets, in particular, are cyclical by nature; (c) the primary source of repayment for these types of loans is the cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE concentrations.   In short, concentrations of CRE loans in the volatile commercial real estate

market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices and concentration ratios.

41.     Despite these risks, Defendants continued to approve questionable loans, including the Loss Transactions with, among other things: (a) excessive or miscalculated LTV ratios; (b) incomplete, inaccurate, or inadequate borrower financial information; (c) missing or inadequate financial project analysis; (iv) incomplete, inaccurate, outdated, or missing appraisal information; and (v) inadequate action plans for dealing with problem loans.

**B.     Loan Regulations and Guidance**

42.     The FDIC, as required by 12 U.S.C. § 1831p-1, has established safety and soundness standards which apply to all insured banks.   These standards, Appendix A to 12 C.F.R.  Part 364, "*Interagency Guidelines Establishing Standards for Safety and Soundness*," prescribe operational and managerial standards for, among other things: internal controls; loan documentation; credit underwriting; asset growth; and asset quality.   These standards provide:

     a.     as to internal controls, that there is (i) an organizational structure that establishes clear lines of authority and responsibility for monitoring adherence to established policies, (ii) effective risk assessment and (iii) compliance with applicable laws and regulations;

     b.     as to loan documentation, that loan documentation practices allow an institution to (i) make informed lending decisions and assess risk as necessary on an ongoing basis, (ii) identify the purpose of a loan and assess the ability of a borrower to repay the indebtedness in a timely manner, and (iii) demonstrate appropriate administration and monitoring of a loan;

     c.     as to credit underwriting, that an institution's prudent credit underwriting practices (i) are commensurate with the types of loans the institution will make, (ii)

consider the nature of the markets in which loans will be made, (iii) provide for consideration, prior to credit commitment, of the borrower's overall financial conditions and resources, the financial responsibility of any guarantor, the nature and value of any underlying collateral and the borrower's character and willingness to repay as agreed, and (iv) take adequate account of concentration of credit risk;

      d.     as to asset growth, an institution's asset growth should be prudent and consider any increase in credit risk as a result of growth and the effect of growth on the institution's capital; and

      e.     as to asset quality, that an institution maintain a system commensurate with its size and the nature and scope of its operations to identify problem assets and prevent deterioration in those assets, and specifically to estimate the inherent losses in those assets and establish reserves that are sufficient to absorb estimated losses and consider the size and potential risks of material asset concentrations.

43.    The FDIC, as required by 12 U.S.C. §1828(o), has prescribed standards for real estate lending to be used by insured banks which require insured state banks to adopt and maintain written policies that establish appropriate limits and standards for extensions of credit that are secured by liens on or interests in real estate or that are made for the purpose of financing permanent improvements to real estate.  These policies must establish loan portfolio diversification standards, prudent underwriting standards, including loan-to-value limits that are clear and measurable, loan administration procedures for the bank's real estate portfolio, and documentation, approval, and reporting requirements to monitor compliance with the bank's real estate lending policies.  *See* 12 C.F.R. § 365.2.

44.     The *Interagency Guidelines For Real Estate Lending Policies* directs that the institution should consider both internal and external factors in formulating its loan policies, including:

      a.     the size and financial condition of the institution;

      b.     the expertise and size of the lending staff;

      c.     the need to avoid undue concentrations of risk; and

      d.     market conditions.

45.     The *Interagency Guidelines For Real Estate Lending Policies* identify the market supply and demand factors that should be considered, including:

      a.     demographic indicators, including population and employment trends;

      b.     current and projected vacancy, construction, and absorption rates; and

      c.     economic indicators, including trends and diversification of the lending area.

46.     The *Interagency Guidelines For Real Estate Lending Policies* identify the underwriting standards that should be included in a bank's loan policy, including:

      a.     the capacity of the borrower, or income from the underlying property, to adequately service the debt;

      b.     the value of the mortgaged property;

      c.     the overall creditworthiness of the borrower;

      d.     the level of equity invested in the property;

      e.     any secondary sources of repayment;

      f.     any additional collateral or credit enhancements, such as guarantees;

      g.     loan-to-value limits by type of property;

h.      for development and construction projects and completed commercial properties, requirements for feasibility studies;

i.      minimum requirements for initial investment and maintenance of hard equity by the borrower (cash or unencumbered investment in the underlying property);

j.      minimum standards for net worth, cash flow, and debt service coverage of the borrower or underlying property;

k.      standards for the acceptability of and limits on non- amortizing loans;

l.      standards for the acceptability of and limits on the use of interest reserves;

m.      re-leasing and pre-sale requirements for income-producing property;

n.      pre-sale and minimum unit release requirements for non- income-producing property loans; and

o.      requirements for takeout commitments.

**C.      The Bank's Loan Policy and Loan Approval Process**

47.      The loan approval process is a bank's foremost means to control loan quality and maintain the integrity of a bank's loan portfolio.  An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based. The purpose of a loan approval process is to provide controls to ensure acceptable credit, collateral, and repayment sources at origination.

48.      The Bank revised its Loan Policy on December 21, 2006, and made subsequent additions and revisions to that Loan Policy on or about March 29, 2007, June 21, 2007, August 23, 2007, May 22, 2008, October 9, 2008, November 20, 2008, January 19, 2009, April 3, 2009, and August 20, 2009.

49.     The Bank recognized that adherence to its Loan Policy was critical, stating in its Loan Policy that "[t]he bank desires to instill a credit culture that actively supports the extension of credit on the basis of sound, fundamental lending principles;" that "[t]he purpose of each credit extension is to be clearly documented, must prove economic benefit, and be acceptable within policy guidelines" and that "[c]redit is only to be granted to reputable borrowers and only when supported by reliable financial and credit information."  *See* Loan Policy § 1.1–5.

50.     Accordingly, the Bank's Loan Policy provided requirements and guidelines for, among other things, loan documentation, underwriting, analysis of borrowers' and guarantors' financial conditions, loan-to-value ratios, appraisals, and characteristics of desirable and undesirable loans.  Some of these material provisions in place at the time of the approvals of the six Loss Transactions include the following:

a.     The Loan Policy required a loan memorandum ("Loan Approval Memorandum" or "LAM") for all commercial and industrial, commercial real estate, and construction loans.  *See* Loan Policy § 1.11–7.  The Loan Policy required that the LAM demonstrate sound sources of repayment and include an evaluation of collateral and a narrative addressing, among other things, guarantor analysis, history and business of the borrower, industry discussion, bank relationship, other banking or borrowing relationships, key risks and mitigating factors, financial analysis, business plan and projections, and policy exceptions.  *Id*.  Relationship managers were expected to make a complete analysis and recommendation as to all commercial and industrial, commercial real estate and construction loans in the LAM.  *Id.*  The underwriting requirements for the specific types of credit also should have been addressed in the LAM.  *Id.*

b.      The Bank relied on source of repayment as the primary factor in determining the acceptability of an applicant's credit request. *Id.*, § 1.1–5. The Bank recognized that cash flow was most often the primary repayment source for both individuals and companies, and, accordingly, required that historic and projected cash flows be analyzed for adequacy and reliability. *Id.*, § 1.1–5. Additionally, the Loan Policy provided that the Bank's position should be on at least equal footing with the obligor's other lenders with respect to payment priority, collateral, and all other material matters. *Id.*, § 1.1–5-6. Thus, the LAM should justify and document any junior or inferior position in a Credit Work Sheet, and explicitly approved the junior or inferior position. *Id.*, § 1.1–6. Further, all loans and guarantees were to be supported by acceptable trade reports, direct trade checks, and/or credit bureau reports, as well as collateral verifications and/or appraisals and current financial information. *Id.* In evaluating credit requests of $100,000 or more, the Bank was required to obtain three years of business financial statements and tax returns, among other things. *Id.*, § 1.12–1, 6.

c.      Additionally, for all real estate and real estate-related financial transactions, the Loan Policy required a documented appraisal, which must analyze appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units. *See* Loan Policy §§ 1.6–1, 1.11–7.

d.      For all commercial and industrial loans, CRE loans, and construction loans, the Loan Policy also required credit reports from reputable reporting firms such as Dun & Bradstreet; commercial credit inquiries to other banks, major suppliers, and non-

bank lenders; a UCC search; and individual credit reports from individual guarantors. *Id.*, § 1.11–2. The Loan Policy also required financial statements, with appropriate certifications, signatures, and representations as to the completeness and accuracy of the financial statements, for such loans. *Id.*, § 1.12–1.

      e.      The Loan Policy had several requirements specific to all guarantees, including:

- All guarantees were to be supported by current financial statements and/or collateral.

- An individual guarantor was required to provide tax returns to verify capacity to service the debt.

- The guarantor's ability to provide defensible collateral or obligate all the assets on a financial statement should have been verified by the Bank.

- Account managers should determine if the financial statements represent the sole and separate holdings of the guarantor.

- The guarantor's ownership or control over substantial assets, such as trusts, should be analyzed.

*Id.*, § 1.5–1.

      f.      The Loan Policy also provided supervisory LTV limits. The LTV limit was set at 65% for raw land, 75% for land development, and 80% for non-residential construction loans. *Id.*, §§ 6.1–3, 6.3–5. The maximum LTV ratio for CRE loans was the lesser of 85% of market value, purchase price, or cost. *Id.*, § 6.6–6. Non-conforming loans should seldom be granted, and, if such a loan is considered, the relationship

manager was required to justify the exception in the LAM and the loan had to be approved by the CCO. *Id.*, § 6.1–5.

g.      With respect to renewals, the Loan Policy provided that loans also generally should not be extended or renewed without a principal reduction. *Id.*, § 1.11–9.

h.      For all commercial development projects, the borrower's equity contribution had to be the greater of either 25% of the project cost, or sufficient funds so that the Bank's acquisition loan would not exceed to the amount of the construction loan takeout. *Id.*, § 6.3–4.

i.      The minimum debt coverage ratio required by the Loan Policy was 1.20:1. *Id.*, § 6.6–6.

51.     The Loan Committee met monthly to review the Bank's lending activities.  The Bank's Loan Policy did not require Board approval of loans; approval authority was delegated, in most cases, to a Board-created Loan Committee.  The Loan Policy also provided, however, that lending officers and bank executives could approve certain small loans, and that, in lieu of approval by the full Loan Committee, loans could be approved "in rare instances" by a combination of any three of the Chief Operating Office ("COO"), Chief Lending Officer ("CLO"), Chief Executive Officer ("CEO"), or Chairman of the Board.  The Kansas legal lending limit for secured loans was 25% of the Bank's total capital.  *See* K.S.A. § 9-1104(b).

52.     Four of the six Loss Transactions were approved by a majority of the Loan Committee.  The Land Fund Holdings loan was approved by Defendants Lindamood, Roby, and Thompson, who were the Bank's CCO, CEO, and Board Chairman at the time.  The Mid-America Bookbinding loan was approved by Defendant Nixon, who was the Bank's CLO at the time.

### D.      Loan Underwriting Violations and Deficiencies

53.      As detailed herein, substantial losses were sustained by reason of the Executive Officer's negligent and the Defendants' grossly negligent departures from safe and sound banking practices.   Each of the Defendants repeatedly negligently and/or grossly negligently disregarded the Bank's Loan Policy and approved loans and loan participations involving: disregard for the Bank's basic loan approval processes; violations of the Bank's LTV policies; failure to obtain collateral appraisals or adequate collateral appraisals; failure to obtain title insurance; failure to perform cash-flow or borrower/guarantor financial analysis; failure to analyze the economic feasibility of projects proposed for funding; inadequate or inadequately-valued collateral; improperly- or inadequately-perfected security interests; borrowers who were not creditworthy or who had provided inadequate financial information; projects that involved insufficient collateral and guarantees for repayment; projects that purported to be dependent on the sale of developed property for repayment of the loan, but which did not extend sufficient funds to finance the anticipated development; and failures to account for known weaknesses or unfavorable trends in relevant markets.

54.      Between at least December 27, 2007 and August 20, 2008, Defendants repeatedly engaged in a pattern and practice of approving loans and loan purchases that: (1) violated the Bank's Loan Policy, including, without limitation, the policy provisions set out above; (2) evidenced systematic deficiencies in the Bank's underwriting, approval, and administration processes; and (3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

E.       **The Six Loss Transactions**

55.      For each of the Loss Transactions, Executive Officers were negligent and the Defendants were grossly negligent and breached their fiduciary duties, in violation of the Bank's Loan Policy, applicable rules and regulations, and prudent banking practices.

56.      The documentation of the Loss Transactions, including the Loan Approval Memoranda presented to and approved by the Loan Committee, showed that the Loss Transactions violated the Bank's Loan Policy, regulatory laws, regulations and standards, and principles of prudent lending, or, alternatively, showed that the information was insufficient to support any informed or reasonable decision to approve the proposed loans.

57.      Each of the Loss Transactions violated the Bank's Loan Policy in numerous respects and illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that resulted in losses and that constitute negligence, gross negligence, and breaches of fiduciary duties, either separately or together as a pattern or practice.

58.      For each of the Loss Transactions, the Bank first placed the loans on non-accrual status in anticipation of default within two years of FNBO's failure.  Thus, the date(s) of the substantial injuries alleged in this suit or the date(s) that such injuries became reasonably ascertainable were all within two years prior to the date the Bank failed.  In addition, and in the alternative, the statute of limitations also was tolled under the doctrine of adverse domination with respect to the Loss Transactions because they were approved by, among other Defendants, E. Glasnapp, R. Glasnapp, Meyer, Pflumm, Roby, Schwader, Thompson, Weltsch and Wright, who made up a majority of the Board at the time the Loss Transactions were approved through the date of FNBO's failure on August 12, 2011.  Under Kansas law, the limitations period is tolled as long as a bank is dominated by the same wrongdoers against

whom a cause of action exists.  Only when a new entity takes control of the bank, be it a receiver or new board of directors, can suit against the wrongdoers be brought as a practical matter.

### 1.    The Glendale Loan

59.    In January 2008, Defendants E. Glasnapp, R. Glasnapp, Lindamood, Meyer, Pflumm, Schwader, Thompson, Weltsch, and Wright approved a $12 million loan to Glendale Jet Center, LLC ("GJC") for the purpose of retiring an $8 million loan used to acquire two leases for parcels of land totaling approximately 138 acres near a municipal airport in Glendale.  The remaining portion of the funds was used for loan fees and an interest reserve account ($2 million) and to provide construction funds for improvements GJC and RightPath Limited Development Group, LLC ("Righpath") were supposed to make on the parcels ($2 million).  The proposed improvements included the construction of 500,000 square feet of hangar space at the Glendale airport purportedly to serve 150 aircraft.  The Glendale loan was secured by deeds of trust recorded against GJC's and RightPath's leasehold interests in the parcels.

60.    GJC and RightPath signed the leases with the City of Glendale in 2007 and 2008. The leases required GJC and RightPath to construct improvements on the lands, and gave the City of Glendale the right to terminate the leases as to portions of the land that were not developed by a certain date.  The leases also prohibited certain mortgages, stating, for example, that RightPath's leasehold interest could only be encumbered to secure loans made to RightPath, not another entity, such as GJC.  The leasehold interests were also subject to prior agreements between the City of Glendale and a third party who had donated the land to the City, which prohibited certain improvements of the lands, including those for which FNBO provided funding.  The estimated cost to complete the planned improvements was $9,231,100.

61.    The Defendants knew or should have known of these issues, as indicated by,

among other things, the plain language of the leases, the fact that the title insurance contained an exclusion for "ANY FAILURE to comply with the terms, covenants and condition of the lease or leases," or the fact that the Bank instructed a third-party appraiser of the lands to assume that "the City will not terminate the lease agreement at the end of the 10th year on the portion of the property not yet developed."  Nevertheless, Defendants E. Glasnapp, R. Glasnapp, Lindamood, Meyer, Pflumm, Schwader, Thompson, Weltsch, and Wright voted to approve the loan.

62.     In addition, the Loan Approval Memorandum reviewed and approved by these Defendants showed that the borrowers contributed no equity to the project, a direct violation of the Bank's Loan Policy requirement of a 25 percent equity contribution for construction loans. The LAM also lacked the required analysis of the feasibility of the project.  The LAM noted that the borrowers' proposed 500,000 square feet of hangar space would accommodate 150 aircraft, but there was little discussion about whether that kind of demand existed for the Glendale airport, again a direct violation of the Bank's loan policy which required a rigorous analysis of a construction project's feasibility.  In fact, no such demand existed, and that is one of the primary reasons the borrowers could not complete construction and defaulted on the loan.

63.     The LAM also did not contain any discussion at all of a take-out loan for FNBO's $12 million commitment.  This was a direct violation of the Loan Policy that required that, ideally, a take-out loan would be closed at the same time as a construction loan, or at the very least, the LAM should include the terms and conditions for a take-out loan.  Moreover, the borrowers would need $9.231 million in *additional* funding to complete the project, but the LAM contained no discussion or analysis of where this additional funding would originate.

64.     The LAM described the previous development experience for the guarantors of the loan, but that experience did not include airport development or management.  This was a

---

direct violation of the Loan Policy requirement that a borrower must have prior business experience with the type of project for which it is seeking funding.

65.     The LAM showed that the borrower GJC, was a start-up LLC with just $278,000 in funds and no prior business operating experience or history, and no apparent ability to repay the loan.  Defendants failed to perform any cash-flow analysis on the borrower or the guarantors as required by the Loan Policy, and failed to obtain adequate financial information regarding GJC and the guarantors.

66.     GJC failed to obtain the additional $9.231 million in funding, and never began construction of the planned improvements on the land.  In July 2009, the Bank approved a six-month extension of the loan without any principal reduction—in direct violation of Loan Policy provisions requiring principal reductions for renewals or extensions—and by August 2009, the borrowers were in default under the leases and embroiled in litigation with the City of Glendale and the third party.  Two of the three guarantors were bankrupt by November 2009.  In 2010, the borrowers assigned their leasehold interests to the Bank, and the Bank began negotiating with the City of Glendale to try to extend the reversion deadline.  The Bank negotiated to extend the reversion deadline to August 1, 2016, but was also saddled with a clause that allowed the City to cancel the lease as to any portion of the property still held by the Bank on August 1, 2014.

67.     At the time they approved the Glendale loan, Defendants E. Glasnapp, R. Glasnapp, Lindamood, Meyer, Pflumm, Schwader, Thompson, Weltsch, and Wright knew or should have known that the loan violated numerous provisions of the Bank's Loan Policy and general prudent lending practices by, among other things, failing to obtain adequate collateral; failing to obtain or require adequate financial information and documentation for the borrower and guarantors; failing to conduct adequate financial analysis of the borrowers and guarantors;

failing to conduct an adequate cash-flow analysis or evaluation of the project viability; and failing to obtain an adequate appraisal for the collateral on the loan.

68.    As a direct and proximate result of the negligent and/or grossly negligent approval of this loan by Defendants E. Glasnapp, R. Glasnapp, Lindamood, Meyer, Pflumm, Schwader, Thompson, Weltsch, and Wright, and the breach of these Defendants' fiduciary duties to the Bank, damages of at least $11.257 million were sustained.

### 2.    The Lenexa Loan

69.    In May 2008, Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Pflumm, Schwader, Weltsch, and Wright voted to approve a $5.7 million loan to Lenexa Lodging Properties, LLC ("Lenexa") for the purpose of constructing a "Suburban Extended Stay" hotel in Lenexa, Kansas.

70.    The LAM approved by the Defendants for the Lenexa loan showed that the loan violated several provisions of the Bank's Loan Policy and was contrary to generally prudent lending practices.  First, Lenexa was a newly-formed entity with no operating history and no funds, and no independent ability to repay the loan.  In fact the LAM stated expressly that "[t]he planned hotel project [was] new construction with no historical financial track record," and repayment of the loan was "entirely dependent on projected revenues."

71.    Second, the LAM stated that projected revenues for the hotel were based on a pro forma projection provided by the borrowers that assumed an occupancy rate 26% higher than the Lenexa average and 34% higher than the national average for extended stay hotels.  The LAM stated that the loan officer did not know how the borrowers derived their pro forma occupancy and room rate projections, and also stated that the loan officer could not independently verify the projections.  The LAM stated that if the industry averages for occupancy rates for suburban

extended stay hotels were used instead, the debt service coverage ratio ("DSCR") for the loan fell to .33, in direct violation of the Loan Policy requirement of at least a 1.2 DSCR.

72.     This was, however, actually the second hotel-construction loan made to the two principals of Lenexa.  The first loan of $4.76 million was approved by the Bank in February 2007.  That extended-stay hotel was 30% complete in October 2007 when it was consumed in a catastrophic fire.  At the time of the Lenexa loan, the construction of the first hotel had resumed and was approximately 70% complete.  The LAM stated that there were already 12 extended stay hotels in the suburban Kansas City market, and the LAM contained no analysis of whether the market could support two more.

73.     Defendants also approved the loan based on outdated, inadequate financial information and analysis of the guarantors.  According to the LAM, one guarantor, who had a credit score of 649, provided unsupported financials that appeared to be contradicted by the Bank's own investigation.  The LAM stated that "the guarantor's cash flow numbers are not accurate … ."  The LAM also stated that the guarantor had been recently arrested for "lewd and lascivious behavior."  According to the LAM, the other guarantor claimed a total of $25,000 in liquid assets, but a recent annual cash-flow deficit of $53,000.  Despite these facts, and the numerous violations of the Loan Policy detailed above, and the fact that together, these two individuals had already borrowed over $4 million from the bank, the Defendants agreed to loan them an additional $5.7 million.

74.     At the time that they approved the Lenexa Loan, Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Pflumm, Schwader, Weltsch, and Wright  knew or should have known that the loan violated the Bank's Loan Policy and general prudent lending practices in at least the following respects:  guarantors/borrowers lacked earnings and cash flow to

support the debt;  the loan officer did not know how the borrowers derived the revenue projections that the borrowers presented to the Bank in support of the loan, nor could the loan officer independently verify those projections; there was no appraisal; there were no personal guarantees signed by the guarantors; there was no analysis of the economic feasibility of construction of another extended stay hotel in suburban Kansas City; and there was no title insurance.

75.     As a direct and proximate result of the negligent and grossly negligent approval of this loan by Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Pflumm, Schwader, Weltsch, and Wright, and the breach of these Defendants' fiduciary duties to the Bank, damages of at least $2.301 million were sustained.

### 3.     The Wolf Creek Grocery Store Loan

76.     In May 2008, the Bank loaned Wolf Creek Marketplace, Inc. ("Wolf Creek") $6.607 million to build a grocery store in Basehor, Kansas.   The loan was approved by Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Pflumm, Roby, Thompson, Weltsch, and Wright.   Defendant Herbert made the presentation of the loan to the Loan Committee and recommended the approval of the loan.

77.     Wolf Creek was a start-up company with no operating history and no funds.  The company planned to start up a non-chain grocery store in Basehor, Kansas, which is a rural community of about 4,600 people located 20 miles west of Kansas City.  The loan was to be repaid solely from the grocery store's sales, but the LAM noted that competition in the grocery business in that area already was intense, with established competitors located just five and six miles away.

78.     The Defendants' approval of this loan violated several provisions of the Bank's Loan Policy and was contrary to generally prudent lending practices.  For example, the LAM

stated that the value of the loan was $6.607 million, and the completed value of the grocery store was $7.48 million. The resulting 88% LTV exceeded the 75% limit set by Bank's Loan Policy.

79.     In direct violation of the Loan Policy, Defendants failed to analyze whether the three owners of Wolf Creek, who also were guarantors for the loan, had sufficient cash flow to service the debt in the event that sales failed to meet projections. The LAM showed that the combined liquid assets of the three guarantors totaled $232,000, while the annual debt repayment requirement of the loan was $339,000. It also disclosed that one of the three guarantors had declared bankruptcy seven years prior to the origination of the loan and had a current negative net worth, while the other two had net worth based almost entirely on illiquid interests in unrelated small businesses. The LAM did not analyze the guarantors' other businesses or existing debt obligations, as required by the Loan Policy, but noted that illiquidity was a weakness of the proposed credit. The store was built, opened for business in July 2009, and failed just seven months later.

80.     At the time that they approved this loan, Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Pflumm, Roby, Thompson, Weltsch, and Wright knew or should have known that the loan violated the Bank's Loan Policy and general prudent lending practices in at least the following respects: no global cash flow analysis of the borrower; guarantors/borrowers lacked earnings and cash flow to support debt; e x c e s s i v e   L T V   r a t i o ;  missing financial information and inadequate financial analysis; and insufficient assessment of project viability.

81.     As a direct and proximate result of the negligence and/or gross negligence of Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Pflumm, Roby,

Thompson, Weltsch, and Wright, and the breach of these Defendants' fiduciary duties to the Bank, damages of at least $3.120 million were sustained.

### 4. The Red & Blue Loan

82.     In April 2008, Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Roby, Schwader, Thompson, Weltsch, Wright loaned Red and Blue Holdings, LLC ("R&B") $1.369 million to purchase and redevelop a small 4-acre trailer park in an industrial area northwest of Phoenix, Arizona.   Defendant Lindamood recommended the approval of the loan to the Loan Committee.  The loan was renewed in December 2010.

83.     The Defendants failed to obtain an appraisal of the property prior to approval, in violation of Loan Policy provisions requiring an appraisal of collateral and in disregard of Loan Policy provisions governing LTV limits for CRE loans.  Without a value of the land from an appraisal, calculation of a loan to value ratio was not possible.   An appraisal was obtained eventually, but the Defendants instructed the appraiser to assume that the land was vacant and to ignore existing structures that would need to be demolished.   One of the ignored structures required asbestos remediation.

84.     In violation of the Loan Policy, there was little or no analysis of the ability of the borrower to repay the loan or the feasibility of planned development, which was to be office and warehouse space on four acres of land.  The LAM stated that R&B was a single-asset entity with no income, and the only source of repayment was lease payments on the built out warehouses and office space, or a sale of the developed land at some undetermined point in the future.  The LAM notes further that the borrower still needed to "[o]btain[] permits and get[] drawings," which he anticipated would take a year.  The LAM also stated that 90% of the guarantor's net worth was "illiquid."

85.     Additionally, although the land was still surrounded by vacant lots, and although the LAM notes that a local real estate newsletter was "somewhat negative about the office market," the LAM expresses enthusiasm about the project based on the "limited supply of new space for users" in the area without any analysis of whether there was any demand for the proposed warehouses and office space proposed by the borrower, a violation of the Loan Policy requirement that the LAM must contain an analysis of the feasibility of a proposed project.

86.     At the time that they approved this loan, Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Roby, Schwader, Thompson, Weltsch, Wright knew or should have known that the loan violated the Bank's Loan Policy and general prudent lending practices in at least the following respects:  guarantor/borrower lacked earnings and cash flow to support debt; loan files were missing financial information and/or contained inadequate financial analysis; inadequate and/or non-existent appraisal; and no analysis of the feasibility of the proposed construction project.

87.     As a direct and proximate result of the negligence and/or and gross negligence of Defendants E. Glasnapp, R. Glasnapp, Herbert, Lindamood, Meyer, Nixon, Roby, Schwader, Thompson, Weltsch, and Wright, and the breach of these Defendants' fiduciary duties to the Bank, damages of at least $0.884 million were sustained.

### 5.     The Land Fund Holdings Loan

88.     In July 2008, Defendants Lindamood, Roby, and Thompson—who were the Bank's CCO, CEO, and Board Chairman at the time—approved the purchase of a loan participation of $4.75 million out of a total loan of $19 million to Land Fund Holdings 75, LLC ("LFH").  The purpose of the loan was to refinance outstanding debt used to purchase a large plot of land for suburban development southwest of Phoenix, Arizona.

89.     LFH was a single-asset entity with no cash flow, and the only source of repayment was the potential sale of developed properties.  There was little or no financial information for LFH or the borrowers in the Bank's files, and no evidence of investigation of those finances or analysis of LFH's or the guarantors' ability to service the loan.  This was a violation of Loan Policy provisions requiring detailed financial information and analysis of borrowers for loans where the only source of income was potential sales of the financed properties.

90.     There is no evidence that Lindamood, Roby and Thompson undertook any analysis of the feasibility of the proposed development to be funded by the loan—a direct violation of the Loan Policy.

91.     For loans of this size, the Loan Policy requires the preparation of a LAM and presentation of the loan to the Loan Committee for approval, but Lindamood, Roby, and Thompson did not prepare, review, or present a LAM or the loan to the Loan Committee.  In fact, the loan was approved via e-mail correspondence by Defendants Lindamood, Roby, and Thompson.  There also was no evidence of title insurance on the loan in the Bank's files, contrary to Loan Policy requirements.

92.     The amount of the loan also violated the Loan Policy's LTV limits.  The value of the development at the time Defendants Lindamood, Roby, and Thompson approved the Bank's participation was approximately $11 million, which compared to the total value of the $19 million loan, produces a loan-to-value ratio of approximately 172%—a number far in excess of any percentage allowed in the Loan Policy.

93.     At the time that they approved this loan, Defendants Lindamood, Roby, and Thompson knew or should have known that the loan violated the Bank's Loan Policy and

general prudent lending practices in at least the following respects: no global cash-flow analysis; missing financial information and inadequate financial analysis; borrower lacked demonstrated ability to service debt; LTV violation; no analysis of the feasibility of a suburban housing development despite knowledge at the time of approval of existing weakness in the relevant real estate market; and failure to prepare a LAM and obtain proper internal FNBO approvals.

94.      As a direct and proximate result of the negligent and grossly negligent approval of this loan by Defendants Lindamood, Roby, and Thompson, and the breach of these Defendants' fiduciary duties to the Bank, damages in an amount of at least $2.012 million were sustained.

### 6.      The Mid-America Bookbinding Loan

95.      In August 2009, Defendant Nixon, the Bank's Chief Lending Officer, unilaterally approved a loan of $361,000 to purchase the assets and equipment of a failing bookbinding business. The loan was to be repaid from profits and cash flow of the business, but the borrower was already having cash flow problems with the business in the previous year. Nixon nevertheless performed no global cash-flow analysis for the borrower, as required by the Bank's Loan Policy, and no analysis of the feasibility of the bookbinding business going forward, also a violation of the Bank's Loan Policy. The loan was secured by the assets and equipment being purchased from the failing company. The Bank's Loan Policy required a physical inspection of the equipment, but none was performed, and the UCC filing did not list any values for the equipment. The loan also violated Loan Policy provisions requiring a higher debt-coverage ratio for loans secured by equipment. The size of the loan, $361,000, exceeded the business' gross revenue of $250,000 for the previous year.

96.      As of November 2009, the loan was already in past-due status. In February 2010, the Defendants extended the loan, without any principal reduction, in violation of the Loan

Policy.  This extension was proposed and approved solely to eliminate the borrower's past-due status.

97.      At the time that he approved this loan, Defendant Nixon knew or should have known that the loan violated the Bank's Loan Policy and general prudent lending practices in at least the following respects:  guarantor/borrower lacked earnings and cash flow to support debt; missing financial information and/or inadequate financial analysis; insufficient assessment of project viability; and loan was extended without principal reduction and solely to cure delinquency status.

98.      Upon information and belief, as a direct and proximate result of the negligent and grossly negligent approval of this loan by Defendant Nixon, and the breach of his fiduciary duty to the Bank, damages of at least $0.339 million were sustained.

## V.      CAUSES OF ACTION

### F.      Negligence

99.      The FDIC incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

100.      Executive Officers Herbert, Lindamood, Pflumm, Roby, and Thompson owed duties of care under KAN. STAT. ANN. § 17-5831, among other laws, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the management, oversight, and conduct of the Bank's business and financial affairs, including its lending practices.  Each Executive Officer agreed and was obligated by statute and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that their actions were in compliance with all laws, rules and regulations, as well as all applicable policies, rules, and regulations of the Bank.

101.    The Executive Officers, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.  As Executive Officers and members of the Loan Committee, the Executive Officers' duties included, but were not limited to, ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally-accepted prudent lending practices and principles; informing themselves about proposed loans and the risks those loans posed to the Bank prior to approval; ensuring that the loans they approved were underwritten in a safe and sound manner; ensuring the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that the loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

102.    Notwithstanding these duties, Defendant Herbert approved three of the six Loss Transactions discussed herein, in violation of Bank's Loan Policy and contrary to generally prudent lending practices, as detailed in paragraphs Sections IV(E)(2), (3), and (4) above.

103.    Notwithstanding these duties, Defendant Lindamood approved five of the six Loss Transactions discussed herein, in violation of Bank's Loan Policy and contrary to generally prudent lending practices, as detailed in paragraphs Sections IV(E)(1)-(5) above.

104.    Notwithstanding these duties, Defendant Pflumm approved three of the six Loss Transactions discussed herein, in violation of Bank's Loan Policy and contrary to generally prudent lending practices, as detailed in paragraphs Sections IV(E)(1)-(3) above.

105.    Notwithstanding these duties, Defendant Roby approved three of the six Loss Transactions discussed herein, in violation of Bank's Loan Policy and contrary to generally prudent lending practices, as detailed in paragraphs Sections IV(E)(3)-(5) above.

106.    Notwithstanding these duties, Defendant Thompson approved four of the six Loss Transactions discussed herein, in violation of Bank's Loan Policy and contrary to generally prudent lending practices, as detailed in paragraphs Sections IV(E)(1) and (3)-(5) above.

107.    By their actions and inactions, as described specifically and generally herein, the Executive Officers, as executive officers of the Bank and members of the Bank's Loan Committee, failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.      Pursuing an aggressive growth strategy that resulted in undue concentrations of CRE loans and that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

b.      Failing to ensure that the Bank's CRE lending complied with the Bank's policies and procedures, banking statutes, and regulations, and prudent and sound lending practices;

c.      Disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags," with respect to the Bank's CRE lending;

d.      Failing to inform themselves about the risks that the Loss Transactions posed to the Bank before they approved them;

e.     Failing to exercise independent judgment in connection with the review and approval of the Loss Transactions;

f.     Failing to ensure that the Loss Transactions approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

g.     Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

h.     Failing to ensure that the Loss Transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

i.     Approving Loss Transactions without proper analysis of the feasibility of the project being funded;

j.     Approving Loss Transactions without proper analysis of the global cash flows of the borrowers and/or guarantors;

k.     Failing to implement and monitor prudent risk management strategies; and

l.     Approving loans which violated the Bank's Loan Policy and sound and prudent underwriting standards.

108.   As a direct and proximate result of the Executive Officers' negligence, damages in the amount of at least $19.93 million were sustained.

**G.     Gross Negligence**

109.   The FDIC incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

110.   Section 1821 (k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 182l(k), provides that directors and officers of

failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  Under Kansas law, gross negligence is something more than ordinary negligence but less than a willful act.  It indicates a realization of the imminence of danger and a reckless disregard, complete indifference, or an unconcern for the probable consequences.

111.    In the alternative, the acts or omissions of each of the Defendants, as described specifically and generally herein, and especially for damages occurring after the Defendants were aware of regulatory warnings and guidance regarding CRE loans, as set forth in paragraphs 30-34 and 43-46 above, of overconcentration of CRE loans and deficiencies in loan underwriting and credit administration, which warnings were effectively ignored, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

112.    Each of the Defendants acted with gross negligence by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices; disregarding regulators' warnings and guidance regarding CRE loans; approving high-risk, poorly-underwritten CRE loans; and allowing the Bank's loan portfolio to be over-concentrated in speculative CRE loans and thereby harming FNBO's earnings, liquidity, and capital-to-asset ratio.

113.    As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, damages in the amount of at least $19.93 million were sustained

---

**ORIGINAL COMPLAINT**                                                                                       37

### H.   Breach of Fiduciary Duty

114.   The FDIC incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

115.   As directors and officers of the Bank, each of the Defendants occupied a fiduciary relationship with the Bank, which placed a special trust and confidence in the Defendants.  The Defendants owed the Bank a duty to act with the utmost good faith, honesty, and loyalty in the management and conduct of the Bank's business, property and financial affairs and work with due regard to and to advance the interests of the Bank.

116.   By their actions and inactions as described in this Complaint, the Defendants failed and neglected to fulfill their respective fiduciary duties to the Bank.  Defendants allowed the Bank's assets to be wasted by approving or recommending the Loss Transactions without adherence to the Bank's Loan Policy and prudent lending practices, among other things.

117.   In the alternative to Counts 2 and 3 in this Complaint, the acts and omissions of each Defendant, described herein and above, constitute breaches of their fiduciary duties to the Bank.  As a direct and proximate result of the Defendants' breaches of their fiduciary duty to the Bank, damages in the amount of at least $19.93 million were sustained.

## VI.   DEMAND FOR JURY TRIAL

118.   The FDIC-R demands a trial by jury on all issues.

## VII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Federal Deposit Insurance Corporation as Receiver for First National Bank of Olathe requests entry of judgment in its favor against Defendants as follows:

1.   For compensatory damages, in an amount to be proved at trial;

2.   For its costs of suit against all Defendants;

---

3.      Pre- and post-judgment interest as allowed by law; and

4.      Such other and further relief as the Court deems just and proper.

Requested Place of Trial: Kansas City, Kansas

Dated: August 8, 2014

Respectfully Submitted,

**FIELDS & BROWN, LLC**

/s/ Taylor Fields                                          /s/ J. David Bowers
Taylor Fields, KS# 77913                         J. David Bowers, KS# 70467
1100 Main, Suite 1600                             1100 Main, Suite 1600
Kansas City, Missouri 64105                      Kansas City, MO 64105
(816) 474-1700 Telephone                       (816) 474-1700 Telephone
(816)421-6239 Facsimile                          (816) 421-6239 Facsimile
tfields@fieldsandbrown.com                     dbowers@fieldsandbrown.com

**ESTES OKON THORNE & CARR PLLC**

Dawn C. Estes, TX# 14251350                    Katherine M. Anand, TX# 24050223
(*pro hac vice application to be filed*)          (*pro hac vice application to be filed*)
3811 Turtle Creek Blvd., Suite 2000            3811 Turtle Creek Blvd., Suite 2000
Dallas, Texas 75219                                  Dallas, TX 75219
(214) 599-4000 Telephone                        (214) 599-4000 Telephone
(214) 599-4099 Facsimile                          (214) 599-4099 Facsimile
destes@estesokon.com                             kanand@estesokon.com

Anthony P. Miller, TX# 24041484
(*pro hac vice application to be filed*)
3811 Turtle Creek Blvd., Suite 2000
Dallas, Texas 75219
(214) 599-4000 Telephone
(214) 599-4099 Facsimile
amiller@estesokon.com

**ATTORNEYS FOR PLAINTIFF FEDERAL**
**DEPOSIT INSURANCE CORPORATION AS RECEIVER**
**FOR FIRST NATIONAL BANK OF OLATHE**